UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| MIECO LLC, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | CIVIL ACTION NO. 3:21-CV-1781-B |
| § | |
| PIONEER NATURAL RESOURCES § | |
| USA, INC., § | |
| § | |
| Defendant. § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiff MIECO, LLC ("MIECO")'s Motion for Summary Judgment (Doc. 54) and Defendant Pioneer Natural Resources USA, Inc. ("Pioneer")'s Motion for Summary Judgment (Doc. 56). For the reasons explained below, the Court **DENIES** MIECO's Motion and **GRANTS in part** and **DENIES in part** Pioneer's Motion. Specifically, the Court **GRANTS** Pioneer's Motion as to MIECO's breach of contract claim and accordingly **DENIES** MIECO's Motion as to that claim. And the Court **DENIES** both MIECO and Pioneer's Motions as to Pioneer's breach of contract counterclaim.

I.

BACKGROUND

In February 2021, Winter Storm Uri battered the Southern United States, disrupting power, water, and, as relevant here, natural gas production across the region. Pioneer had contracted to supply natural gas to MIECO each day. For several days, Pioneer failed to deliver

the full amount of gas, instead declaring force majeure. The key question in this case is whether Winter Storm Uri constitutes an force majeure event under the parties' Contract.[1]

A.   *Factual Background*

Many of the facts are not in dispute. MIECO, the buyer in this case, is an energy trading firm that buys and sells natural gas. Doc. 55-3, Pl.'s App., 53, Gil-Hernandez Decl., ¶ 2. Pioneer, the seller, is a petroleum exploration and production company that produces and sells natural gas. Doc. 72-3, Def.'s Revised App., 348, Brown Decl. ¶¶ 3, 8. Pioneer's natural gas supply comes from its crude oil extraction operations in the Permian Basin in Texas. *Id.* ¶¶ 3–4, 8. As a byproduct of crude oil extraction, Pioneer produces casinghead gas, which Pioneer sends to processing plants. *Id.* ¶¶ 3, 5. The vast majority goes to one processor, Targa Pipeline Mid-Continent WestTex, LLC ("Targa"). *Id.* ¶ 5. After Targa processes the casinghead gas, it delivers in-kind residue methane gas and natural gas liquids to Pioneer at the exit point of its processing plants in the Permian Basin. *Id.* ¶ 8. Pioneer considers this residue gas its "gas supply" for its sales to its customers. *Id.* ¶¶ 8, 10. If Pioneer experiences shortfalls in its gas supply from Targa and its contractual performance is not excused, Pioneer purchases gas in the "spot market"[2] to cover the shortfall. *Id.* ¶ 11.

On September 4, 2020, MIECO and Pioneer reached an agreement for MIECO to purchase 20,000 million British thermal units ("MMBtu") of natural gas from Pioneer each day

---

[1] Three documents set out the parties' agreement in this case: (1) a Base Contract for Sale and Purchase of Natural Gas (the "Base Contract"), Doc. 72-3, Def.'s Revised App., 31–43, (2) Special Provisions to Base Contract for Sale and Purchase of Natural Gas (the "Special Provisions"), *id.* at 44–52, and (3) a transaction confirmation, numbered 793604 (the "Transaction Confirmation"), *id.* at 60. The Court refers to these documents collectively as the "Contract."

[2] As Pioneer explains in its brief, in the natural gas context, "a 'spot market' is a 'market in which natural gas is bought and sold for immediate or very near-term delivery, usually for a period of 30 days or less.'" Doc. 72-1, Def.'s Upd. Br., 6 n.3 (quoting the U.S. Energy Information Administration Glossary).

from November 1, 2020, to March 31, 2021. Doc. 55-3, Gil-Hernandez Decl., ¶ 4. The parties agreed that Pioneer would deliver the gas at two points near the border of Arizona and California. *Id.* This agreement was memorialized in a transaction confirmation, numbered 793604 (the "Transaction Confirmation"). *Id.* ¶ 5 & Ex. A. Transaction confirmations are customary in the natural gas industry and are subject to the provisions of a base contract, which contains the core terms of the agreement, as well as any special provisions that modify the base contract. *Id.* ¶ 5; Doc. 72-3, Brown Decl., ¶ 13. In this case, the Transaction Confirmation was subject to the Base Contract and the Special Provisions, which the parties entered on October 28, 2014. Doc. 55-3, Gil-Hernandez Decl., ¶ 5; Doc. 72-3, Brown Decl., ¶ 12.

In February 2021, Winter Storm Uri arrived. In Texas, the storm brought unprecedented low temperatures and extensive ice storms. Doc. 72-3, Def.'s Revised App., 1, Smead Dep., 26. The natural gas industry saw rapid well and pipeline freeze-offs that significantly limited production for Pioneer and other gas producers in the surrounding area. *Id.*; Doc. 72-3, Def.'s Revised App., 61, McBeath Report, 5–10. For Pioneer, the most severe impact was between February 12 and February 24, 2021. Doc. 72-3, McBeath Report at 9.

Each day from February 14 to February 19, 2021, Pioneer failed to deliver the full amount of natural gas it had contracted to deliver to MIECO. Doc. 55-3, Pl.'s App., 58, Johnson Decl., ¶¶ 6–9, 12–15. On February 14, 2021, Pioneer failed to deliver 9,570 MMBtu of gas. *Id.* ¶ 6. Pioneer did not warn MIECO in advance, so MIECO did not realize that Pioneer would not be delivering the full amount until late in the day. *Id.* ¶ 7. To fulfill its obligations to its own customers, MIECO reallocated some natural gas it had contracted to purchase for other purposes two days earlier. *Id.* ¶ 8. The following day, Pioneer again failed to deliver the contractual

amount without advance notice, this time failing to deliver 15,491 MMBtu. *Id.* ¶ 9. Again, MIECO redirected previously purchased gas to cover the shortfall. *Id.*

Shortly after midnight on February 16, 2021, Pioneer sent MIECO a notice of force majeure, dated February 15, 2021, via email. *Id.* ¶ 10. The notice stated Pioneer was "declaring an event of force majeure and is unable to deliver and sell the full volume of gas" under the parties' Contract. Doc. 55-3, Pl.'s App., 1, Andrews Decl. Ex. B. From February 16 to February 19, Pioneer delivered MIECO no gas, and MIECO purchased gas on the spot market to cover the shortfall. Doc. 55-3, Johnson Decl., ¶¶ 12–15. During this period, Pioneer made no efforts to purchase replacement gas on the spot market. Doc. 55-3, Andrews Decl. Ex. D, Linkletter Dep., 42–44.

Although Pioneer had not yet lifted its force majeure declaration, Pioneer resumed daily delivery of the full 20,000 MMBtu of gas on February 20, 2021. *See* Doc. 55-3, Johnson Decl., ¶ 16. These deliveries continued until March 1, 2021, when Pioneer delivered only 17,600 MMBtu of gas. *Id.* ¶¶ 16–17. MIECO purchased replacement gas, which cost $2,388 more than the Contract price. *See id.* ¶ 22. Pioneer withdrew its force majeure declaration two days later. Doc. 72-3, Def.'s Revised App., 139. When Pioneer sent an invoice for the total gas sales for March 2021 (the "March invoice"), MIECO underpaid by $2,388 to cover the cost differential of the replacement gas. Doc. 55-3, Johnson Decl., ¶ 22.

On July 30, 2021, MIECO brought this suit against Pioneer. Doc. 1, Compl. MIECO alleges Pioneer breached the parties' Contract by failing to deliver 20,000 MMBtu of gas each day from February 14 to February 19, 2021. Doc. 4, Am. Compl., ¶ 33. MIECO seeks $9,083,518.98 in damages, "the cost of cover for the natural gas not delivered by Pioneer." *Id.* ¶ 35. Pioneer admits it did not deliver the full amount of gas during the period in question. Doc.

11, Answer, 4. But Pioneer asserts its nonperformance was due to Winter Storm Uri and was therefore excused by the contract's force majeure provision. *Id.* Pioneer also asserts a counterclaim against MIECO, alleging MIECO's underpayment of the March invoice constituted a breach of the Contract. *Id.* at 17. Pioneer seeks $2,388 in damages on its counterclaim. *Id.*

The parties filed cross-motions for summary judgment (Docs. 54 & 56), each seeking summary judgment on both MIECO's claim and Pioneer's counterclaim. The Court considers the Motions below.

## II.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law governing a matter determines which facts are material to a case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The summary-judgment movant bears the burden of proving that no genuine issue of material fact exists. *Latimer v. Smithkline & French Lab'ys*, 919 F.2d 301, 303 (5th Cir. 1990). Usually, this requires the movant to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted).

Once the summary-judgment movant has met this burden, the burden shifts to the non-movant to "go beyond the pleadings and designate specific facts" showing that a genuine issue exists. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (citing *Celotex*, 477 U.S. at 325). "This burden is not satisfied with 'some metaphysical doubt as to the material

facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Id.* (citations omitted). Instead, the non-moving party must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis and quotation marks omitted).

"[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the [non-movant]." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations and quotation marks omitted). But the Court need not "sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citation and quotation marks omitted). If the non-movant is unable to make the required showing, the Court must grant summary judgment. *Little*, 37 F.3d at 1076.

## III.

## ANALYSIS

A.  *MIECO's Breach of Contract Claim*

Both parties move for summary judgment on MIECO's breach of contract claim. *See* Docs. 54, 56. The parties agree Pioneer contracted to provide MIECO 20,000 MMBtu of natural gas per day and Pioneer failed to deliver that amount on the days in question. MIECO argues it is entitled to summary judgment on its breach claim because Pioneer's non-delivery breached the parties' contract and was not excused by force majeure. Doc. 55-1, Pl.'s Br., 11. Pioneer argues it is entitled to summary judgment because its non-delivery was excused by the contract's force majeure provision. Doc. 72-1, Def.'s Upd. Br., 2.

The Court first sets out the applicable law, then examines the Contract. After determining the force majeure provision is unambiguous, the Court addresses whether either party is entitled to summary judgment. Because the Court agrees that Pioneer's non-delivery was

excused, the Court **GRANTS** Pioneer's Motion and **DENIES** MIECO's Motion as to MIECO's breach of contract claim.[3]

1.  Applicable Law

The Court first must decide what law governs the Contract. "To determine the applicable law, a federal court sitting in diversity applies the choice of law rules of the forum"—in this case, Texas. *Ottemann v. Knights of Columbus*, 36 F.4th 600, 605 (5th Cir. 2022). "Contractual choice-of-law clauses are generally valid under Texas law unless they violate one of the limitations set forth in the Restatement (Second) of Conflict of Laws § 187." *Dynamic CRM Recruiting Sols., L.L.C. v. UMA Educ., Inc.*, 31 F.4th 914, 918 (5th Cir. 2022). The parties selected New York law to govern their contract. *See* Doc. 55-3, App. 5, § 15.5. Because the parties agree that New York contract law applies and its application would not violate a fundamental public policy of Texas, the Court applies it below.

"In New York, [the] general contract interpretation principles are well established." *Donohue v. Cuomo*, 184 N.E.3d 860, 866 (N.Y. 2022). "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent. The best evidence of what parties to a written agreement intend is what they say in their writing." *Greenfield v. Philles Recs., Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002) (citations and quotation marks omitted). "The words and phrases used by the parties must . . . be given their plain meaning." *Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014). New York courts routinely reject constructions of contracts which render contractual language superfluous. *See Lawyers' Fund for Client Prot. of State of N.Y. v. Bank Leumi Tr. Co. of N.Y.*, 727 N.E.2d 563, 566–67 (N.Y. 2000)

---

[3] The parties also dispute whether MIECO calculated its damages correctly. Because the Court finds that MIECO is not entitled to damages, the Court does not address the parties' arguments concerning the proper measure of damages.

("In the end, Bank Leumi's interpretation would render the second paragraph superfluous, a view unsupportable under standard principles of contract interpretation."). "Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990). The Court may consider extrinsic evidence of the parties' intent only if the contract is ambiguous. *Greenfield*, 780 N.E.2d at 170.

Whether a contract is ambiguous is a question of law for the Court to decide. *Id.* "Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent, or when specific language is susceptible of two reasonable interpretations." *Ellington*, 21 N.E.3d at 1003 (citation and quotation marks omitted). "[A] contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion." *Donohue*, 184 N.E.3d at 867 (alterations omitted). Where "the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter [that meaning]." *Greenfield*, 780 N.E.2d at 171. If a contract is unambiguous, the subsequent construction and interpretation of the contract are matters of law for the Court. *NRT N.Y., LLC v. Harding*, 16 N.Y.S.3d 255, 258 (N.Y. App. Div. 2015).

Under New York law, contractual force majeure clauses provide a narrow defense. *Kel Kim Corp. v. Cent. Markets, Inc.*, 519 N.E.2d 295, 296 (N.Y. 1987). "Ordinarily, only if the *force majeure* clause specifically includes the event that actually prevents a party's performance will that party be excused." *Id.* But "[w]hen the parties have themselves defined the contours of force majeure in their agreement, those contours dictate the application, effect, and scope

of force majeure." *Constellation Energy Servs. of N.Y., Inc. v. New Water St. Corp.*, 46 N.Y.S.3d 25, 27 (N.Y. App. Div. 2017).

    2.    The Parties' Contract

As previously explained, the Contract is comprised of three documents: (1) the Base Contract, (2) the Special Provisions, and (3) the Transaction Confirmation. Doc. 55-3, Gil-Hernandez Decl., ¶ 5; Doc. 72-3, Brown Decl., ¶ 12. Section 11 of the Base Contract addresses force majeure.

The section states, in relevant part,

SECTION 11. FORCE MAJEURE

11.1. Except with regard to a party's obligation to make payment(s) due under Section 7, Section 10.4, and Imbalance Charges under Section 4, neither party shall be liable to the other for failure to perform a Firm obligation, to the extent such failure was caused by Force Majeure. The term "Force Majeure" as employed herein means any cause not reasonably within the control of the party claiming suspension, as further defined in Section 11.2.

11.2. Force Majeure shall include, but not be limited to, the following: . . . (ii) weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe . . . . Seller and Buyer shall make reasonable efforts to avoid the adverse impacts of a Force Majeure and to resolve the event or occurrence once it has occurred in order to resume performance.

11.3. Neither party shall be entitled to the benefit of the provisions of Force Majeure to the extent performance is affected by any or all of the following circumstances: . . . (ii) the party claiming excuse failed to remedy the condition and to resume the performance of such covenants or obligations with reasonable dispatch; . . . or (v) the loss or failure of Seller's gas supply or depletion of reserves, except, in either case, as provided in Section 11.2.

. . .

11.5. The party whose performance is prevented by Force Majeure must provide Notice to the other party. . . . Upon providing written Notice of Force Majeure to the other party, the affected party will be relieved of its obligation, from the onset of the Force Majeure event, to make or accept delivery of Gas, as applicable, to

>the extent and for the duration of Force Majeure, and neither party shall be deemed to have failed in such obligations to the other during such occurrence or event.
>
>. . .

Doc. 55-3, App. 13, § 11. The Special Provisions modified the Base Contract

>by deleting the words "any cause not reasonably within the control of the party claiming suspension" in the last sentence [of Section 11.1 of the Base Contract] and replacing it with the following:
>
>"an event or circumstance which prevents one party from performing its obligations under one or more Transactions, which event or circumstance was not anticipated as of the date of the Transaction was agreed to, which is not within the reasonable control of, or the result of the negligence of, the claiming party, and which, by the exercise of due diligence, the claiming party is unable to overcome or avoid or cause to be avoided."

*Id.* at App. 21, § 11.

### 3. Ambiguity

To determine whether the Contract is ambiguous, the Court reads "the contract . . . as a whole" to see if it "fails to disclose its purpose and the parties' intent" or if "specific language is susceptible of two reasonable interpretations." *See Ellington*, 21 N.E.3d at 1003 (quotation marks omitted). Section 11.1 (as modified by the Special Provisions) states force majeure is "an event or circumstance which prevents one party from performing its obligations under one or more Transactions, . . . as further defined in Section 11.2." Doc. 55-3, App. 13, 21. Section 11.2 provides "Force Majeure shall include," among other things, "weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe." *Id.* at App. 13, § 11. And Section 11.3 provides "the loss or failure of [Pioneer's] gas supply or depletion of reserves," does not constitute force majeure, unless the loss or failure is caused by one of the circumstances listed in Section 11.2. *Id.*

Putting these sections together, force majeure includes a loss or failure of Pioneer's gas supply (Section 11.3) caused by low temperatures that affected an entire geographic region and caused freezing or failure of wells or lines of pipe (Section 11.2) that prevented Pioneer from performing under the Contract (Section 11.1). Because "the [force majeure provision] on its face is reasonably susceptible of only one meaning," *see Greenfield*, 780 N.E.2d at 171, the Court finds the contractual language is unambiguous. Here, Pioneer was prevented from performing under the Contract because it lost its gas supply—the residue gas from Targa's processing plants in the Permian Basin—due to low temperatures that affected an entire geographic region—Winter Storm Uri. Therefore, Pioneer's non-delivery was excused by force majeure. MIECO offers three reasons why Winter Storm Uri's effect on Pioneer's production and processing facilities is not covered by the force majeure provision. None is persuasive.

First, MIECO argues that to constitute force majeure, an event must render performance literally impossible, citing Section 11.1 and the Oxford English Dictionary definition of "prevent." Doc. 78, Pl.'s Resp. Br., 8–9. MIECO notes the delivery points were 900 miles away from Pioneer's operations in the Permian Basin. *Id.* at 7–8. Because Pioneer contracted to deliver natural gas at specific locations, MIECO claims, if Pioneer could acquire natural gas and deliver it to MIECO, it had an obligation to do so. *Id.* at 7–9.

The Court is not persuaded by this interpretation of the Contract. As MIECO's brief acknowledges, MIECO's definition of the word "prevent" is not the only definition. Although prevent may mean "to preclude the occurrence of (an anticipated event, state, etc.)," the dictionary MIECO cites also defines "prevent" as "to render (an intended, possible, or likely action or event) *impractical* or impossible by anticipatory action." *Id.* at 8 (citing *Oxford English*

*Dictionary* (3rd ed. 2007)) (emphasis added). This latter meaning is supported by the force majeure section as a whole.

Requiring a party to show true impossibility would render portions of the Force Majeure Section superfluous, including the requirement that the claiming party be "unable to overcome or avoid" the event "by exercise of due diligence." *See* Doc. 55-3, App. 21, § 11. Similarly, many of the provisions in Section 11.3 that specifically exclude circumstances from force majeure are superfluous under this reading. *See id.* at App. 13 § 11. Standard principles of contractual interpretation do not support such a reading. *See Lawyers' Fund*, 727 N.E.2d at 566–67.

This reading would also make the force majeure provision essentially duplicative of the common law defense of impossibility, which "excuses a party's performance only when the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible." *Kel Kim*, 519 N.E.2d at 296 (1987). Force majeure ordinarily excuses a party's performance "only if the *force majeure* clause specifically includes the event that actually prevents a party's performance." *See id.* If MIECO is correct that "prevent" means "render impossible" and force majeure is limited to events specifically included in the provision, the force majeure provision would provide *less* protection than an impossibility defense. If an event not named in the provision made performance impossible, the party could assert a common law impossibility defense but not a force majeure defense. The force majeure provision would have no practical legal effect.

Although *Ergon-West Virginia, Inc. v. Dynegy Marketing & Trade* applies Texas law, the Court finds it persuasive on the facts of this case. 706 F.3d 419 (5th Cir. 2013). Dynergy entered a contract to deliver natural gas to Ergon Refining and Ergon-WV at designated delivery points.

*Id.* at 422, 424 n.5. "When Hurricanes Katrina and Rita hit in 2005 . . . Dynegy's own internally designated suppliers declared force majeure," and Dynergy followed suit. *Id.* at 422. Ergon Refining and Ergon-WV sued Dynergy, arguing, among other things, Dynergy was prevented from invoking force majeure because the contract provided "that a party must be 'rendered unable' to perform 'wholly or in part' by force majeure . . . [and] even after the 2005 hurricanes, Dynegy had the physical capacity to continue supplying gas to the designated delivery points and could still purchase gas on the spot market." *Id.* at 424 n.5. The Fifth Circuit dismissed this argument in a footnote. The court stated,

> The district court did not place much weight on this argument, nor do we. The Ergon companies' interpretation would make the force majeure provisions essentially meaningless because it would mean that a seller could never invoke force majeure so long as there was some gas available anywhere in the world, at any price. It was not clearly erroneous for the district court to disagree with this interpretation.

*Id.*

The consequence of MIECO's argument is similar: force majeure applies only if no gas is available "anywhere in the world, at any price" that Pioneer could timely deliver to the designated delivery points. *See id.* The Court rejects this strained reading of the contract. "Standard principles of contract interpretation" counsel against it because the reading would render portions of the contract superfluous. *See Lawyers' Fund*, 727 N.E.2d at 566–67. It makes the force majeure provision functionally duplicative of the common law impossibility defense. And it leads to the absurd results described in *Ergon-West Virginia, Inc.* For these reasons, the Court rejects MIECO's argument that Pioneer cannot claim force majeure unless performance was objectively impossible.

Second, MIECO argues Pioneer lost only its *preferred* source of gas. Doc. 78, Pl.'s Resp. Br., 7. According to MIECO, this loss cannot constitute force majeure because the Contract provides only the price, amount of gas, and delivery point for the transaction. *Id.* In support, MIECO cites *Hess Corp. v. ENI Petroleum US, LLC*, 86 A.3d 723 (N.J. Super. Ct. App. Div. 2014). In *Hess*, ENI Petroleum contracted to deliver Hess Corporation 20,000 MMBtu of natural gas daily at a delivery point in Tennessee. *Id.* at 725. When a leak prevented ENI from transporting gas from its wells in the Gulf of Mexico to the delivery point, ENI declared force majeure. *Id.* The Superior Court of New Jersey, Appellate Division, examined contractual language that provided, "Force Majeure shall include, but not be limited to . . . interruption and/or curtailment of Firm transportation and/or storage by Transporters." *Id.* at 726. The court noted the contract did not specify a specific source of gas to be delivered or a specific pipeline to be used. *Id.* at 727–28. Applying New York law, the court concluded ENI could not invoke force majeure because "[ENI] was required to have gas available [at the delivery point for Hess], regardless of how it got there" and ENI could have used gas from another source or purchased gas on the spot market to meet its contractual obligations. *Id.* at 728.

MIECO claims "*Hess* makes it plain that the availability of alternative gas supplies bars a force majeure defense to non-performance," Doc. 78, Pl.'s Resp. Br., 12. But this reading of *Hess* cannot be reconciled with New York law. Under New York law, where, as here, "the parties have themselves defined the contours of force majeure in their agreement, those contours dictate the application, effect, and scope of force majeure." *Constellation Energy*, 46 N.Y.S.3d at 27. *Hess* held the availability of other gas supplies barred a force majeure defense under the contract at issue. That holding does not control here.

The force majeure provision in this case, unlike the provision in *Hess*, specifically mentions Pioneer's gas supply. The Contract states that failure of Pioneer's gas supply *can* constitute force majeure if the failure was caused by one of the events or circumstances described in Section 11.2 of the Base Contract. Doc. 55-3, App. 13, § 11. While this does not conclusively establish what Pioneer's gas supply *is*, the Contract makes clear that "the loss or failure of Seller's gas supply or depletion of reserves" can constitute force majeure in some circumstances, regardless of the availability of alternative gas supplies. *Id.*

Finally, MIECO argues, because the contract does not define the gas supply to be delivered, "Seller's gas supply" should be understood according to its "plain and ordinary meaning." *See* Doc. 78, Pl.'s Resp. Br., 13. Thus, according to MIECO, the "gas supply" in the force majeure provision is "the amount or quantity of gas that was available to satisfy [Pioneer's] contractual demands"—basically any gas Pioneer produced or could have purchased and timely delivered to MIECO. *Id.* (citing *Va. Power Energy Mktg., Inc. v. Apache Corp.*, 297 S.W.3d 397, 399 (Tex. App.—Houston [14th Dist.] 2009, pet. denied)). Pioneer argues its gas supply is the gas it receives from Targa in the Permian Basin. Doc. 72-1, Def.'s Upd. Br., 5–6.

MIECO's understanding of "Seller's gas supply" cannot be squared with the Contract. Under the Contract, "the loss or failure of Seller's gas supply or depletion of reserves," does not constitute force majeure "except, in either case, as provided in Section 11.2." Doc. 55-3, App. 13, § 11. So under MIECO's definition, if there was no available gas, anywhere in the world, at any price, with which Pioneer could meet its contractual obligation, Pioneer *would still be liable* to MIECO for non-delivery unless Section 11.2 was met. Like MIECO's understanding of "prevent," this interpretation of "Seller's gas supply" makes the force majeure provision duplicative of the common law defense of impossibility. This interpretation is not reasonable.

Pioneer argues its "gas supply" is the natural gas it receives from Targa in the Permian Basin. Doc. 72-3, Brown Decl., ¶¶ 8, 10. This definition avoids the absurd result discussed above. And the Contract's use of the possessive "Seller's" suggests the "gas supply" is owned or possessed by Pioneer, something which cannot be said of the gas on the spot market. Although the Contract does not define "gas supply," the plain meaning of "Seller's gas supply" is the natural gas Pioneer receives from Targa in the Permian Basin. For the reasons discussed above, MIECO's interpretation of "Seller's gas supply" is unreasonable. The Court finds "Seller's gas supply" in Section 11.3 unambiguously means the gas Pioneer receives from Targa in the Permian Basin. *Cf. Ellington*, 21 N.E.3d at 1003 ("Ambiguity in a contract arises . . . when specific language is susceptible of two reasonable interpretations.") (quotations omitted).

4. Breach of Contract

For the above reasons, the Court finds that the Contract unambiguously allowed Pioneer to invoke force majeure during Winter Storm Uri.[4] Therefore, Pioneer did not breach the Contract by failing to deliver the full amount of natural gas required under the Contract between February 14 and February 19. Under New York law, "[t]he essential elements of a cause of action to recover damages for breach of contract are (1) the existence of an enforceable contract, (2) the plaintiff's performance pursuant to that contract, (3) the defendant's breach of the contract, and (4) damages resulting from that breach." *Nassau Operating Co., LLC v. DeSimone*, 171

---

[4] MIECO argues *J.P. Morgan Ventures Energy Corp. v. Miami Wind I, LLC*, 2022 N.Y. Slip Op. 51308(U) (N.Y. Sup. Ct. 2022), supports the opposite conclusion. Doc. 113, Notice Suppl. Auth. In *Miami Wind*, the court held the failure of seller's wind turbines during Winter Storm Uri did not constitute force majeure under their contract to sell electricity. 2022 N.Y. Slip Op. 51308(U), at *4. But the agreements at issue in *Miami Wind* "specifically provide[d] that 'the loss or failure of Seller's supply' d[id] not constitute a force majeure event." *Id.* Here, as previously discussed, the failure of Pioneer's gas supply *can* constitute force majeure if it was caused by one of the events or circumstances described in Section 11.2 of the Base Contract. Doc. 55-3, App. 13, § 11. For this reason, the Court does not find *Miami Wind* persuasive on the facts of this case. *See Constellation Energy*, 46 N.Y.S.3d at 27.

N.Y.S.3d 528, 535 (N.Y. App. Div. 2022). Because there is no genuine dispute of material fact and Pioneer did not breach the Contract as a matter of law, the Court finds Pioneer is entitled to summary judgment on MIECO's breach claim. *See* Fed. R. Civ. P. 56(a). Summary Judgment is **GRANTED** for Pioneer on MIECO's breach of contract claim.

B.   *Pioneer's Counterclaim*

Pioneer asserts a counterclaim for breach of contract against MIECO, alleging MIECO underpaid Pioneer by $2,388 for natural gas Pioneer delivered in March 2021. MIECO asserts this underpayment was to offset the amount of the cover for Pioneer's non-delivery on March 1, 2021. Both parties move for summary judgment on Pioneer's counterclaim. Pioneer claims it is entitled to summary judgment for three reasons: (1) Pioneer's failure to deliver the 20,000 MMBtu was excused under force majeure, (2) MIECO failed to exercise commercially reasonable efforts to purchase replacement gas, and (3) MIECO's underpayment was contractually prohibited "netting." Doc. 72-1, Def.'s Upd. Br., 47–50. MIECO claims Pioneer's non-delivery of gas was not excused by force majeure, and it is therefore entitled to summary judgment on the counterclaim. Because there is a disputed question of material fact as to whether Pioneer properly claimed force majeure for its Mach 1, 2021, non-delivery, the Court denies the parties' motions for summary judgment as to the counterclaim.

There is a dispute of material fact as to whether Pioneer performed its obligations under the contract. On March 1, 2021, Pioneer delivered only 17,600 MMBtu of gas to MIECO, not the full 20,000 MMBtu it was obligated to deliver. The parties dispute whether Pioneer's failure to deliver the full 20,000 MMBtu was excused under force majeure. *See* Doc. 72-1, Def.'s Upd. Br., 46–47; Doc. 78, Pl.'s Resp. Br, 26. The force majeure provision provides, "Neither party shall be entitled to the benefit of the provisions of Force Majeure . . . [if] the party claiming excuse

failed to remedy the condition and to resume the performance of such covenants or obligations with reasonable dispatch." Doc. 55-3, App. 13, § 11.

The Court finds a reasonable jury could conclude that the supply shortfalls had been resolved or Pioneer failed to remedy the effects of Winter Storm Uri and resume performance with reasonable dispatch. Pioneer's force majeure declaration was predicated on the storm "creating supply shortfalls [that] result[ed] in insufficient supplies to make contract sales under the Contract." *See* Doc. 55-3, Andrews Decl. Ex. B. As MIECO points out, from February 20 until the March 1 non-delivery, Pioneer had been delivering the full 20,000 MMBtu of gas. Doc. 55-3, Johnson Decl., ¶ 16. A reasonable jury could therefore conclude Pioneer could not invoke force majeure for its March 1 non-delivery. This disputed material fact precludes summary judgment on the force majeure issue, and thus Pioneer's counterclaim.

Pioneer claims that it is still entitled to summary judgment "even if it is assumed for purposes of argument that force majeure was no longer in effect on March 1." Doc. 72-1, Def.'s Upd. Br., 48. The Court disagrees. If force majeure was no longer in effect, then Pioneer did not perform its contractual obligation to deliver the full 20,000 MMBtu of gas. And because Pioneer bears the burden of proof on its counterclaim, it must show that it performed its obligations under the contract. The Court **DENIES** Pioneer's Motion for Summary Judgment as to its counterclaim.

MIECO's summary judgment motion is denied for the same reason. MIECO argues, "Pioneer's non-delivery of gas was not excused by force majeure. Accordingly, there is no basis for Pioneer's counterclaim." Doc. 55-1, Pl.'s Br., 15. A reasonable jury could conclude that Pioneer was remedying the effects of Winter Storm Uri and resuming performance with reasonable dispatch. Because the Court cannot determine that Pioneer's non-delivery was not

excused by force majeure, the Court **DENIES** MIECO's Motion for Summary Judgment as to Pioneer's counterclaim.

## IV.

## CONCLUSION

The Court **DENIES** MIECO's Motion and **GRANTS in part** and **DENIES in part** Pioneer's Motion. For the reasons explained above, the Court finds the force majeure provision in the Contract is unambiguous and Pioneer's non-delivery from February 14 to February 19, 2021, constituted force majeure under the Contract. Because Pioneer's February non-delivery did not breach the Contract, the Court **GRANTS** Pioneer's Motion as to MIECO's breach of contract claim and **DENIES** MIECO's Motion as to that claim.

Regarding Pioneer's March 1, 2021, non-delivery, the Court finds there is a disputed material fact as to whether Pioneer remedied the effects of Winter Storm Uri and resumed performance with reasonable dispatch. For this reason, the Court cannot grant summary judgment on Pioneer's breach of contract counterclaim. The Court therefore **DENIES** both MIECO and Pioneer's Motions as to Pioneer's breach of contract counterclaim.

SO ORDERED.

SIGNED: February 15, 2023.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE