UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MIECO LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:21-CV-1781-B |
| | § | |
| PIONEER NATURAL | § | |
| RESOURCES USA INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

Plaintiff MIECO, LLC ("MIECO") asserts a breach of contract claim against Defendant Pioneer Natural Resources USA Inc. ("Pioneer") for failing to deliver 20,000 MMBtu (million British thermal units) of natural gas from February 14 to February 19, 2021, during Winter Storm Uri and instead declaring force majeure. Following the bench trial on Plaintiff's breach of contract claim and having heard the testimony and reviewed the admitted exhibits, the Court now enters its findings of fact and conclusions of law as to this claim pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

For the reasons set forth below, the Court finds in favor of Pioneer in this case. Specifically, the Court finds Pioneer did not breach its contract with MIECO. The Court therefore will enter judgment in favor of Defendant on Plaintiff's breach of contract claim.

# I.

## FINDINGS OF FACT[1] AND PROCEDURAL BACKGROUND

The Court applies the standard the Fifth Circuit set for findings and conclusions under Federal Rule of Civil Procedure 52. *Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) ("Rule 52(a) exacts neither punctilious detail nor slavish tracing of the claims issue by issue and witness by witness . . . . The rule is satisfied if the district court's findings give the reviewing court a clear understanding of the basis for the decision.") (internal quotations omitted). In reaching its decision, the Court relied upon facts that are either undisputed or based on the testimony of the witnesses it found credible and believable.

This case returns to this Court from the Fifth Circuit after it affirmed in part and reversed in part the Court's award of summary judgment to Pioneer on February 15, 2023 (Doc. 128, Mem. Op. & Order), and remanded for further findings. *Mieco, L.L.C. v. Pioneer Nat. Res. USA, Inc.*, 109 F.4th 710, 728 (5th Cir. 2024). Specifically, the Fifth Circuit upheld this Court's interpretation that "the [force majeure] clause's terms do not require Pioneer to show that the storm rendered its performance under the contract literally impossible" and that "Pioneer's 'gas supply' under the [force majeure] clause encompasses only the gas Pioneer regularly produced from the Permian Basin—and not . . . substitute gas that Pioneer does not own but could purchase on the spot market." *Id.* at 713. The case was remanded to resolve the following material fact disputes: (1) whether Pioneer's performance was actually prevented, and (2) whether Pioneer exercised due diligence by making reasonable efforts to avoid Uri's adverse impacts. *Id.* at 727.

---

[1] Insofar as any finding of fact constitutes a conclusion of law, it is adopted as a conclusion of law; and insofar as any conclusion of law made herein constitutes a finding of fact, it is hereby adopted as a finding of fact.

The Court therefore conducted a bench trial for fact finding on those issues. The bench trial in this case lasted three days. The Court heard testimony from twelve witnesses. Eleven witnesses testified in person: Ms. Ana Gil-Hernandez, Ms. Elsa Johnston, Mr. Peter D'Anna, Mr. Darren Brown, Ms. Donna Sowle, Mr. Scott Linkletter, Mr. Richard Smead, Mr. Cody Pye, Mr. John Campbell McBeath, Ms. Kris Terry, and Dr. Stephen Becker. One witness's testimony, Mr. Kyle Pearson, was submitted into the record via his deposition transcript.[2] Both parties also presented exhibits including documents such as the underlying contract, internal corporate communications, and reports. Having heard the testimony and reviewed the exhibits, the Court makes the following findings of fact as to MIECO's claims:

A.    *Breach of Contract*

1.    <u>The Parties and the Contract</u>

MIECO is an oil and natural gas trader. Trial. Tr. vol. 1, 90:8-25; Trial Tr. vol. 2, 116:10-14.

Pioneer is a natural gas producer that drills for and extracts crude oil in the Permian Basin, which is in West Texas. Trial Tr. vol. 2, 116:2-3; 117:1-3. All of the natural gas that Pioneer produces and processes for sale is processed by Targa Pipeline Mid-Continent WestTex, LLC ("Targa"), whose plants were located solely in the Permian Basin at all relevant times.[3] Trial Tr. vol. 2, 121:3-11.

MIECO and Pioneer entered into a contract in 2014 and a transaction confirmation in 2020. Pl.'s Ex. 1-3.

The contract at issue (the "Contract") consists of (1) a "Base Contract for Sale and Purchase of Natural Gas," dated October 28, 2014, which is a standard form published by the North American

---

[2] At the time of trial, Mr. Pearson was seriously ill and therefore unavailable to testify. *See* FED. R. CIV. P. 32(a)(4)(C).

[3] In *Mieco*, 109 F.4th at 721, the Fifth Circuit held that Pioneer's gas from the Permian Basin is the sole natural gas that constitutes Pioneer's "gas supply" to which the Section 11.3 of the Contract refers.

Energy Standards Board (the "NAESB Base Contract"); (2) a document entitled "SPECIAL PROVISIONS TO BASE CONTRACT FOR SALE AND PURCHASE OF NATURAL GAS DATED OCTOBER 28, 2014 BETWEEN PIONEER NATURAL RESOURCES USA, INC. AND MIECO INC." (the "Special Provisions"); and (3) a transaction confirmation dated September 4, 2020. *Id.*

The transaction confirmation called for Pioneer to sell to MIECO 20,000 MMBtu (million British thermal units) of natural gas on a Firm basis, at a price tied to an industry index, each day between November 1, 2020, and March 31, 2021. *Id.* Section 2.19 of the NAESB Base Contract defines "Firm" as meaning "that either party may interrupt its performance without liability only to the extent that such performance is prevented for reasons of force majeure." *Id.* The natural gas was to be delivered at a contractual delivery point at the Arizona-California border—primarily the delivery point at Ehrenberg, Arizona—subject to the terms and conditions of the Base Contract and the special provisions. Doc. 190, Joint Pre-Trial Order, 19.[4] The Ehrenberg, Arizona delivery point serves as a connection between the pipeline system owned by El Paso Natural Gas Company and the pipeline system owned by Southern California Gas Company. *Id.*

New York law governs the "interpretation and performance" of the parties' Contract. Pl.'s Ex. 1, at 2.

The force majeure provision is Section 11 of the NAESB Base Contract and was amended by the parties' special provisions, as bolded below:[5]

> Section 11.1: [N]either party shall be liable to the other for failure to perform a Firm obligation, to the extent such failure was caused by Force Majeure. The term "Force

---

[4] In addition to the testimony and exhibits presented at trial, the Court also relies on the facts to which the parties stipulated.
[5] *See* Mieco, 109 F.4th at 714-15.

Majeure" as employed herein means **an event or circumstance which prevents one party from performing its obligations under one or more Transactions, which event or circumstance was not anticipated as of the date of the Transaction was agreed to, which is not within the reasonable control of, or the result of the negligence of, the claiming party, and which, by the exercise of due diligence, the claiming party is unable to overcome or avoid or cause to be avoided,** as further defined in Section 11.2.

> Section 11.2: Force Majeure shall include, but not be limited to, the following . . . (ii) weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe . . . Seller and Buyer shall make reasonable efforts to avoid the adverse impacts of a Force Majeure and to resolve the event or occurrence once it has occurred in order to resume performance.

> Section 11.3: Neither party shall be entitled to the benefit of the provisions of Force Majeure to the extent performance is affected by any of the following circumstances:[6] . . . (iii) economic hardship, to include, without limitation, Seller's ability to sell Gas at a higher or more advantageous price than the Contract Price, Buyer's ability to purchase Gas at a lower or more advantageous price than the Contract Price, or a regulatory agency disallowing, in whole or in part, the pass through of costs resulting from this Contract; . . . or (v) the loss or failure of Seller's gas supply or depletion of reserves, except, in any case, as provided in Section 11.2.

In the past, when the gas that Targa delivered to Pioneer would not meet Pioneer's Firm delivery obligations, Pioneer either purchased gas on the spot market or reduced the volume of its Firm obligations through "buy backs," through which Pioneer paid MIECO the difference between the contract volume and delivered volume. Trial Tr. vol. 2, 125-26. February 2021 was the first and only instance Pioneer declared force majeure to MIECO. *Id.*

2. Winter Storm Uri and its Effect on Gas Production in the Permian Basin

In February 2021, Winter Storm Uri hit West Texas, where Pioneer's wells and Targa's processing plants are located, and caused severe operational disruptions and shutdowns in the

---

[6] The Fifth Circuit characterized Section 11.3 as the "list of events *excluded* from force majeure[.]" *Mieco*, 109 F.4th at 718.

Permian Basin. Doc. 194, Dep., 6:15-17. Witnesses called Uri "unprecedented" in terms of severity and "truly cataclysmic" to the natural gas market in Texas. Trial Tr. vol. 2, 65:16-20; 218:10-14. Due to the understated forecast, preparations made prior to the start of Uri did not anticipate the severity of the Winter Storm. Trial Tr. vol. 2, 220:8-16. Specifically, once Uri hit, the temperatures fell and stayed below freezing for seven days, the conditions became icy and snowy, and West Texas suffered power outages. Trial. Tr. vol. 2, 287:20-25. The worst impacts from Uri were from February 15 to February 19, 2021. Trial. Tr. vol. 2, 286:14-18. During this time, the availability of natural gas was severely curtailed because Uri cut off the gas supply of other producers operating in the affected region while demand was also higher than normal because of unusually cold temperatures in the South and Midwest. Trial Tr. Vol. 2, 287-88. Uri generally led to wellhead freeze-outs, widespread pipeline and processing plant failures, and power blackouts that shut off power to facilities and equipment. Trial Tr. vol. 2, 219:12-21.

Uri's severity and duration caused Pioneer's gas production to drop almost to zero due to its well sites' freezing, equipment failing due to power outages, tanks inaccessible for production, and third parties unable to fulfill their commitment to Pioneer due to their own difficulties with the storm. Trial Tr. vol. 2, 283:17-25; 287:16-25; 288:1-6. As a result, Pioneer declared force majeure and did not deliver the contracted amount of natural gas to MIECO for six days. Specifically, Pioneer delivered 10,430 MMBtu of natural gas to MIECO on February 14, 2021, and 4,509 MMBtu of natural gas to MIECO on February 15, 2021. Doc. 190, Joint Pre-trial Order, 19. Pioneer delivered no natural gas to MIECO from February 16 through and including February 19, 2021. *Id.* Pioneer resumed delivery of the full daily contract amounts on February 20, 2021. *Id.*

Pioneer made no effort to procure replacement gas to make up for shortfalls in its own production. *Id.* On February 12, 2021, Pioneer's management told its traders to stop buying back gas because a force majeure was potentially going to be declared. Pl's. Ex. 52; Trial Tr. vol. 2, 103:10-15. Pioneer's policy was that once a force majeure was declared there would be no purchases of gas from other parties to fulfill its Firm obligations. Trial Tr. vol. 2, 110:3-5.

Pioneer sent MIECO a "Notice of Force Majeure" on February 15, 2021,[7] via email to a MIECO employee that was received shortly after midnight on February 16, 2021. Doc. 190, Joint Pre-Trial Order, 20. This was the first written notice of force majeure Pioneer sent to MIECO. *Id.* Pioneer withdrew this Notice on March 3, 2021. *Id.* Pioneer sent MIECO a "Supplemental Notice of Force Majeure" dated February 18, 2021, and another dated February 19, 2021. *Id.* It withdrew both Notices on February 22, 2021. *Id.* MIECO sent Pioneer an invoice dated March 10, 2021, in the amount of $9,083,518.98 (the "Invoice Amount") derived from the SoCal Citygate index prices for each day Pioneer failed to perform. *Id.* Pioneer has not paid any of the Invoice Amount. *Id.*

i.    *Uri prevented Pioneer's performance*

Winter Storm Uri prevented Pioneer from delivering 20,000 MMBtus under the Contract from February 14, 2021, through and including February 19, 2021, because it rendered Pioneer's full performance impracticable. *See Mieco*, 109 F.4th at 717-19 (finding that a force majeure event need not render performance literally impossible in order to "prevent" performance and noting that Black's Law Dictionary defines a "force-majeure clause" as a "provision allocating the risk of loss if performance becomes impossible or impracticable") (citation omitted). Prior to Uri, Pioneer

---

[7] The Fifth Circuit held that Section 11.5 of the contract "provides notice is effective from the onset of the Force Majeure event, which was February 14, 2021." *Mieco*, 109 F.4th at 717 n.5 (citation omitted).

exercised due diligence in prepping for the forecasted storm in at least four ways: Pioneer (1) switched its allocation of 70% firm and 30% interruptible agreements to 60% firm and 40% interruptible agreements so more gas could be diverted to Firm obligations (Trial Tr. vol. 2, 124:2-19); (2) winterized wells and equipment with insulation, E trace, vapor recovery units, dehydration units, and added methanol to tanks (Trial Tr. vol. 2, 229-31); (3) visited the sites, staged equipment, and prepared its best field resources based on what was forecasted (*Id.*); and (4) purchased 90 MMBtu/day gas on Friday February 12, 2021, for the long weekend (Pl.'s Ex. 34).

The winterization strategy initially worked, and Pioneer was able to meet its Firm obligations on February 13, 2021. Trial Tr. vol. 2. 129:19-25. But by Sunday, February 14, 2021, Pioneer's plants at Midkiff, Gateway, and Pembroke were down or partially operating. Trial Tr. vol. 2, 108:11-24. Pioneer also received notice from Targa that it was declaring force majeure. Def.'s Ex. 147; Trial Tr. vol. 2, 132, 134. During Uri, Pioneer lost 98% of its gas production. Def.'s Ex. 29; Trial Tr. vol. 2, 248:3-6.

ii.    *Pioneer exercised due diligence to mitigate Uri's impacts*

Pioneer exercised due diligence by making reasonable efforts[8] to avoid the adverse impacts of Uri.[9] The evidence clearly rebuts any contention that Pioneer merely sat on its hands and waited for the storm to pass.

During the storm, Pioneer (1) sent teams to the well sites to try to get the wells producing throughout the week of the storm (2) prepared equipment and applicable personnel teams to be

---

[8] The Fifth Circuit found the Contract's Section 11.2 requirement that a party "make reasonable efforts to avoid the adverse impacts of a Force Majeure" is a separate one from requiring the party "to resolve the event or occurrence once it has occurred in order to resume performance." *Mieco*, 190 F.4th at 727.

[9] Whether Pioneer made reasonable efforts is a question of fact. *Marathon Oil Co. v. Koch Energy Servs., LLC*, No. 4:21-CV-1262, 2024 WL 759396, at *6 (S.D. Tex. Feb. 5, 2024), report and recommendation adopted, No. 4:21-CV-1262, 2024 WL 761890 (S.D. Tex. Feb. 23, 2024).

ready to respond upon temperatures increasing and resuming power; and (3) contacted third parties to see if they would perform their obligations to Pioneer during the storm. Def.'s Ex. 163; Trial Tr. vol. 2, 265-66; Doc. 194, Dep., 27-28. Pioneer's personnel pushed these efforts throughout Winter Storm Uri while also facing challenges at home. Trial Tr. vol. 2, 246-47.

Once the weather conditions improved, Pioneer was ready to perform. On February 20, 2021, the same day the Midland Lateral pipeline reverted its flow, permitting Pioneer to transport its gas to MIECO through the El Paso Pipeline, and temperatures increased, Pioneer fully performed its Firm obligation to MIECO. Trial Tr. vol. 2, 141-44. In order to do so, Pioneer paid additional costs to reroute gas through lines that were not directly connected to resume delivery of the full daily contract amounts. *Id.* On February 20, 2021, Pioneer had restored 37-39% of its oil production. Trial Tr. vol. 2, 268-70. By February 24, 2021, Pioneer had restored 84% of its gas production. *Id.*

3.  Industry Custom and Practice

MIECO insists Pioneer could have purchased gas from third parties who would have delivered the gas at the delivery points on the California-Arizona border or could have purchased gas elsewhere and transported it to the delivery points on the El Paso Natural Gas pipeline.

But the natural gas industry's custom and practice is that a supplier that has lost its gas supply is not expected to purchase spot market gas as a replacement after declaring force majeure. Trial Tr. vol. 3, 43:2-6. This allows natural gas producers to focus on re-establishing their gas supplies to avoid further driving up spot market prices during a force majeure event and lessens the adverse impact of the event by increasing gas supplies in areas affected by a force majeure event. Trial Tr. vol. 3, 46.

The Court makes this finding based on Terry's expert testimony regarding industry custom and practice, which the Court found credible.[10]

## II.

### CONCLUSIONS OF LAW

For the reasons explained below, the Court finds that the Contract unambiguously permitted Pioneer to excuse its performance pursuant to the force majeure provision of the Contract. The evidence presented to the Court shows (1) Pioneer's performance was prevented because it was hindered and rendered impractical by Uri, and (2) Pioneer exercised due diligence by making reasonable efforts to avoid Uri's adverse impacts.

1. <u>Winter Storm Uri was a Force Majeure event under the Contract</u>

Because "the [force majeure provision] on its face is reasonably susceptible of only one meaning," *see Greenfield v. Philles Recs., Inc.*, 780 N.E.2d 166, 171 (N.Y. 2002), the Court finds the contractual language is unambiguous, and therefore, the subsequent construction and interpretation of the contract are matters of law for the Court. *NRT N.Y., LLC v. Harding*, 16 N.Y.S.3d 255, 258 (N.Y. App. Div. 2015).

Putting these sections together, force majeure includes a loss or failure of Pioneer's gas supply (Section 11.3)[11] due to low temperatures that affected an entire geographic region and caused

---

[10] The Court finds this testimony uncontroverted because Smead, MIECO'S only expert, provided no opinion as to industry and custom, and instead focused on interpreting the language of the Contract, which is not permissible expert opinion. *See Amica Mut. Ins. Co. v. Moak*, 55 F.3d 1093, 1096 n. 5 (5th Cir. 1995) ("The interpretation of a contract is a question of law for the court. Any reliance on this "expert" opinion by the court below was misplaced."); *Novartis Pharma AG v. Incyte Corp.*, No. 1:20-CV-400-GHW, 2024 WL 3608338, at *14 (S.D.N.Y. July 29, 2024) (excluding expert testimony that "purely interpret[s] the text" of a contract).

[11] "Seller's gas supply in Section 11.3(v) refers to the Permian Basin Gas Pioneer produced and processed through Targa, not to gas available on the spot market." *See Mieco*, 109 F.4th at 724 (internal quotation marks omitted).

freezing or failure of wells or lines of pipe (Section 11.2) that prevented[12] Pioneer from performing under the Contract (Section 11.1). Furthermore, Pioneer must show it exercised due diligence by making reasonable efforts to avoid the adverse impacts of Uri and to resolve Uri once it had occurred to resume performance. (Section 11.2).[13]

Winter Storm Uri was a force majeure event[14] that hindered Pioneer's performance during the storm, despite the winterization preparations it made in advance of Uri. Furthermore, Pioneer exercised due diligence by making reasonable efforts to avoid the adverse impacts of Uri by having its personnel attend to its equipment and facilities continuously throughout the storm, so its wells were ready to produce gas the moment temperatures increased and power returned. As a natural occurrence, Uri's duration was out of Pioneer's control, but it is clear from the evidence that Pioneer resumed performance to MIECO as soon as production was possible and even paid additional sums to reroute gas from facilities that were not directly connected to the relevant pipeline to meet its delivery obligations to MIECO within twenty-four hours of the storm ceasing.

Because Uri was a force majeure event as defined by the Contract and Pioneer exercised due diligence to make reasonable efforts to avoid the adverse impacts of Uri and to resolve Uri once it had occurred in order to resume performance, Pioneer satisfied its burden and is not liable to MIECO for breach of contract.

---

[12] "Black's law dictionary defines the term simply as 'stop from happening; to hinder or impede . . . Hinder in turn means to slow down or make difficult, hold back, or impede, delay, or prevent.'" *Id.* at 717 (citation omitted).

[13] "When the parties have themselves defined the contours of force majeure in their agreement, those contours dictate the application, effect, and scope of force majeure." *Constellation Energy Servs. of N.Y., Inc. v. New Water St. Corp.*, 46 N.Y.S.3d 25, 27 (N.Y. App. Div. 2017)

[14] "No party disputes that Uri was" a "weather related event[ ] affecting an entire geographic region" under Section 11.2. *See Mieco*, 109 F.4th at 721.

2.  <u>MIECO's Interpretation of Force Majeure is Unreasonable</u>

MIECO argues Winter Storm Uri was not an event of force majeure as defined by the Contract because Pioneer could have purchased gas for delivery to MIECO or it could have bought back its delivery obligation.[15] Doc. 126, Pl.'s Proposed Findings of Fact & Conclusions, 7-8. The Court rejects this interpretation for two reasons.

First, MIECO's interpretation is unreasonable because it renders Sections 11.2(ii) and 11.3(v)'s explicit ground for weather events as a force majeure event meaningless. The contract clearly states the loss or failure of Pioneer's gas supply (which only includes the gas it produces in the Permian Basin) due to low temperatures that cause freezing or failure of wells or lines of pipe is a force majeure event. But under MIECO's interpretation, a storm like Uri would never prevent Pioneer's performance as long as there is gas somewhere in the world available or Pioneer has cash available to buy-back its obligation. This interpretation would make it impossible for Pioneer to show its performance was prevented under the Contract because a buyer could always point to some gas available to the seller to buy, and the buy-back method is likely never precluded due to a Section 11.2 weather event. Thus, such a reading would foreclose a Section 11.2 weather event from ever

---

[15] MIECO also argues Section 11.3(iii) precludes Pionner's invocation of force majeure because the base contract provides that "[n]either party shall be entitled to the benefit of the provisions of Force Majeure to the extent performance is affected by . . . (iii) economic hardship." But the contract, including the parties' amendment to the base contract, provides that Pioneer's loss of its gas supply because of "weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe" qualifies as grounds for force majeure. Pl.'s Ex. 1. Accordingly, the economic hardship provision does not preclude invoking force majeure. Furthermore, the examples of economic hardships in the contract suggest that the contract forbids a party from declaring force majeure to enter a more economically beneficial transaction, rather than avoid continuing an economically detrimental one. *See id.* ("[E]conomic hardship . . . include[s], without limitation, Seller's ability to sell Gas at a higher or more advantageous price than the Contract Price."); *Mieco*, 109 F.4th at 723 (In *Virginia Power Energy Marketing, Inc. v. Apache Corp.*, 297 S.W.3d 397, 399-401, 407 (Tex. App.—Houston [14th Dist.] 2009, pet. Denied, "Apache failed to deliver gas to Virginia Power after hurricanes Katrina and Rita . . . Apache declared force majeure but then turned around and sold gas on the spot market at higher prices—some of which Virginia Power ended up purchasing.").

excusing a seller's performance because the seller would be unable to satisfy the "prevent" requirement of Section 11.1.

Courts in this circuit have routinely rejected such a result. *See, e.g., Ergon-West Va., Inc. v. Dynegy Mktg. & Trade*, 706 F.3d 419, 424 n.5 (5th Cir. 2013) ("The Ergon companies' interpretation would make force majeure provisions essentially meaningless because it would mean that a seller could never invoke force majeure so long as there was some gas available anywhere in the world, at any price."); *Marathon Oil Co. v. Koch Energy Servs.*, LLC, No. 4:21-CV-1262, 2023 WL 4032879, at *11 (S.D. Tex. May 8, 2023), report and recommendation adopted, No. 4:21CV1262, 2023 WL 4033332 (S.D. Tex. June 15, 2023) ("Koch's interpretation of the contract as requiring Marathon to buy back its obligation would likewise render the Force Majeure provisions meaningless. As Marathon argues, the option of buying back an obligation is 'always possible,' and accordingly 'Marathon could never declare force majeure' if it were held to such an obligation."). The Court likewise rejects this reading of the contract.

Second, MIECO's interpretation is unreasonable because it requires Pioneer, in order to demonstrate due diligence, to perform the very obligation from which it seeks to be excused. Section 2.19 of the NAESB Base Contract defines "Firm" as meaning "that either party may interrupt its performance without liability only to the extent that such performance is prevented for reasons of force majeure." Pl.'s Ex. 1. It is undisputed that in the past MIECO accepted either substitute gas or a buy-back as full performance of Pioneer's Firm obligation when the gas that Targa delivered to Pioneer would not meet Pioneer's 20,000 MMBtu/ day Firm obligation. But in those situations, Pioneer did not have the option to not perform because a shortage of gas without a Section 11.2 event is not a force majeure occurrence. If Pioneer is required to avoid the adverse impact of Uri by

performing its Firm obligation, as MIECO argues, then no performance is being excused.[16] This interpretation therefore renders the exception for force majeure events in the definition of "Firm" superfluous. The Court thus rejects this unreasonable reading of the contract.

Additionally, even if the contract was ambiguous, the extrinsic evidence supports the Court's conclusion that Pioneer was excused from performing under the contract. First, Pioneer's expert has provided credible expert testimony that the industry's custom and practice is that a supplier that has lost its gas supply is not expected to purchase spot market gas as a replacement after declaring force majeure. *See Dynegy*, 706 F.3d at 426 ("The gas industry evidence the district court believed 'highly credible' when it found that Dynegy had no duty to attempt to provide replacement gas to Ergon Refining similarly counsels that we conclude that the supplier had no such duty with respect to Ergon–WV either."); *LNG Americas, Inc. v. Chevron Nat. Gas*, No. CV H-21-2226, 2023 WL 2920940, at *9 (S.D. Tex. Apr. 12, 2023) ("Even if the contract were ambiguous regarding the obligation to purchase replacement gas, this ambiguity would be removed by Defendant's evidence of industry customs" that "industry participants do not expect a natural gas supplier in Chevron's position to be under an obligation to purchase replacement gas to meet supply obligation."). Second, the evidence shows MIECO knew it needed to add special language to the Contract if it desired to preclude a declaration of force majeure when replacement gas could have been purchased at the delivery point. *See* Def.'s Ex. 3. Other contracts into which MIECO entered with other sellers included this explicit language. *Id.* The MIECO- Pioneer Contract does not.

---

[16] *See Mieco*, 109 F.4th at 718; *see also Tejas Power Corp. v. Amerada Hess Corp.*, No. 14-98-00346-CV, 1999 WL 605550, at *3 (Tex. App. Aug. 12, 1999, no pet.) (finding that buying spot market "gas at five times the selling price to compensate for the shortages caused by the inclement weather" was "the very obligation that [defendant] sought to avoid by inclusion of the force majeure clause in the contact.").

## III.

## CONCLUSION

For the foregoing reasons, MIECO has failed to prove by a preponderance of the evidence its breach of contract claim against Pioneer. Thus, MIECO is not entitled to damages or attorneys' fees. A final judgment incorporating these findings and conclusions shall be entered in a separate order.

SO ORDERED.

SIGNED: October 15, 2025.

JANE J. BOYLE
SENIOR UNITED STATES DISTRICT JUDGE